[No. F007501. Fifth Dist. Feb. 24, 1987.]

McCLATCHY NEWSPAPERS, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
PAUL S. MOSESIAN, Real Party in Interest.

## COUNSEL

Gibson, Dunn & Crutcher, Robert S. Warren, Rex S. Heinke, Kelli L. Sager, Dietrich, Glasrud & Jones, Donald H. Glasrud and Timothy J. Buchanan for Petitioners.

No appearance for Respondent.

Nuttall, Berman & Magill and Roger T. Nuttall for Real Party in Interest.

## OPINION

HAMLIN, J.—Petitioners McClatchy Newspapers, Inc., publisher of the Fresno Bee, and two of its reporters, Jeanie Borba and Royal Calkins (collectively petitioners), seek a peremptory writ of mandamus requiring the Fresno County Superior Court (respondent court) to grant petitioners' motion for summary judgment in this libel case. Their petition requires this court to decide whether subdivision 4 of Civil Code section 47 grants the media an absolute privilege to report testimony and other evidence in a libel action even if that testimony was elicited and the other evidence was produced pursuant to a conspiracy to invoke immunity. We find petitioners' report of testimony and documentary evidence that had a reasonable relation to

the action in which they were introduced is absolutely privileged; we will grant a peremptory writ as prayed.

## Procedural and Factual Matters

The real party in interest in this action, Paul S. Mosesian (plaintiff), filed in respondent court an action for libel and false-light invasion of privacy based on an article published in the Fresno Bee on May 31, 1982 (1982 article). The 1982 article reported portions of Fresno Bee reporter Denny Walsh's testimony and excerpts from one of the documents he produced at his deposition in an unrelated libel case, Todisco v. McClatchy Newspapers, Fresno County Superior Court proceeding No. 253232-3 (Todisco litigation). In his deposition testimony Walsh named plaintiff as a member of the "Fresno mob" and defined that mob as "people who enter into conspiracies to subvert our laws."

Petitioners moved for summary judgment, contending their statements were absolutely privileged. When the trial court denied petitioners' motion, they filed in this court a petition for alternative and peremptory writs of mandamus, prohibition and review. This court denied that petition; petitioners sought review by our Supreme Court. The Supreme Court granted review and transferred the case to this court with directions to issue an alternative writ to be heard by this court. An alternative writ was issued as directed.

Petitioners have contended this court should accept as true the allegations in their petition and grant relief as prayed because plaintiff failed to respond to the alternative writ by demurrer or verified answer, or both, as required by Code of Civil Procedure section 1089. After this contention was advanced, plaintiff filed an application for order permitting him to file amendments to his responses. Plaintiff's application based on mistake or inadvertence is granted. However, the court disregards plaintiff's denials on information and belief, or for lack of either, as to facts which are matters of public record. (See 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 990, p. 415.)

Although plaintiff pleaded a cause of action for false-light invasion of privacy in addition to an action for libel, we consider only the libel action in this opinion. ■ When an action for libel is alleged, a false-light claim based on the same facts (as in this case) is superfluous and should be dismissed. (See *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P. 2d 912]; *Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1136 [212 Cal.Rptr. 838].)

## DISCUSSION

### I.

*Peremptory Writ Relief*

Code of Civil Procedure section 437c, subdivision (*l*), provides in pertinent part: ". . . Upon entry of any order pursuant to this section except the entry of summary judgment, a party may . . . petition an appropriate reviewing court for a peremptory writ. . . ." ■ Given the discretionary nature of this type of relief, the petitioner for the issuance of a writ must meet certain threshold requirements. First, the petitioner is compelled to establish the absence of "a plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086.) Additionally, the petitioner seeking extraordinary relief must prove a clear, present and beneficial or substantial right (*Fair* v. *Fountain Valley School Dist.* (1979) 90 Cal.App.3d 180, 186 [153 Cal.Rptr. 56]; *Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 813-814 [25 Cal.Rptr. 798] ), and that the body invested with discretion acted arbitrarily or without due regard for petitioner's rights (*Huntington Park Redevelopment Agency* v. *Duncan* (1983) 142 Cal.App.3d 17, 25 [190 Cal.Rptr. 744]).

■ Plaintiff vehemently argues that petitioners have not met the threshold requirements for extraordinary relief. Specifically, plaintiff urges that trial and appeal provide adequate remedies. Moreover, plaintiff contends the trial court did not act arbitrarily in denying the petition for summary judgment in that it properly found there were triable issues of material fact (Code Civ. Proc., § 437c, subd. (c)).

The threshold requirement that petitioners establish the absence of an adequate remedy at law has already been satisfied. "[B]y directing the issuance of an alternative writ, the Supreme Court has determined that there is no other adequate remedy." (*Amie* v. *Superior Court* (1979) 99 Cal.App.3d 421, 424 [160 Cal.Rptr. 271]. See also *City of Los Angeles* v. *Superior Court* (1959) 51 Cal.2d 423, 429 [333 P.2d 745].)

Our next concern is the existence of a correlative beneficial right or interest held by petitioners and a legal duty, reposed in the judicial body below, which was abused.

■ Clearly, petitioners had a substantial interest in a favorable resolution of their summary judgment motion. Considering the importance of speech freedoms in a democratic society, the expeditious disposition of defamation litigation is paramount. The media pay the price for protracted

proceedings—chilled speech freedoms caused by a hesitancy to print articles carrying the potential for a lawsuit. (See *Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 486-487 [14 L.Ed.2d 22, 28, 85 S.Ct. 1116]; *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 684-685 [150 Cal.Rptr. 258, 586 P.2d 572].) As such, "summary judgment is a favored remedy" in libel actions (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 251 [208 Cal.Rptr. 137, 690 P.2d 610]), and petitioners have a present and beneficial interest in the outcome of such proceedings. Our failure to recognize this right would be equivalent to turning our backs on years of precedent warning of protracted and costly litigation in the First Amendment area.

The final inquiry is whether respondent court has a present duty to grant summary judgment. (See *Mannheim* v. *Superior Court* (1970) 3 Cal.3d 678, 685 [91 Cal.Rptr. 585, 478 P.2d 17].) Plaintiff contends the trial court found the existence of a triable issue of material fact and consequently could not have abused its discretion by denying petitioners' motion for summary relief. A triable issue to which plaintiff points is whether petitioners conspired to present through Walsh's deposition defamatory testimony and documents containing defamatory statements to permit later publication of the libelous information in the Fresno Bee under Civil Code section 47 privileges. However, it is the contested degree of protection provided by section 47 that defines the boundary of the trial court's duty. Hence, we must turn to our analysis of the substantive law; the resulting interpretation of section 47 will indicate whether the lower court committed a legal error and thus abused its discretion. (See 8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, § 87, p. 727.)

II.

*Civil Code Section 47 Privileges*

In pertinent part, Civil Code section 47[1] states, "A privileged publication or broadcast is one made—[¶] . . . [¶] 2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law, . . . [¶] . . . [¶] 4. By a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, . . ." Both subdivisions 2 and 4 are in controversy. Plaintiff argues neither privilege may be claimed by petitioners because of the conspiracy to permit Walsh to make defamatory statements in his deposition regarding plaintiff, thus allowing petitioners to report with immunity Walsh's deposition testimony and excerpts from a California State Department of Justice report prepared by Special Agent

---

[1]Further statutory references are to the Civil Code unless otherwise indicated.

John Gill (Gill Report) on organized crime in the Fresno area on which Walsh relied. Petitioners strongly contend conspiracy or malice allegations do not vitiate the protective cloak of the statute. In addition to this dispute over the nature and extent of the privilege extended by section 47, the parties disagree as to what relationship or pertinency the defamatory statements must have to the proceedings in which they are made to be privileged under subdivision 2 of that section. Finally, the fairness and accuracy of the May 31, 1982, article is challenged by plaintiff in order to preempt an application of subdivision 4.

 A. *Section 47, Subdivision 2: Statements Made in the Course of Judicial Proceedings.*[2]

██ The nature and extent of the privilege bestowed by section 47, subdivision 2, is significant because of its potential effect upon judicial proceedings and the search for truth. Plaintiff urges that a conspiracy designed to introduce defamatory material into judicial proceedings vitiates the statutory privilege. We must evaluate plaintiff's contention in light of an apparent conflict in the decisions of the Court of Appeal.

This court considered the so-called conspiracy exception to the privilege in *Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484 [104 Cal.Rptr. 650]. There, the defendants allegedly submitted a forged or false building permit to the city council, causing the council to deny Pettitt's requested zoning variance. Pettitt's argument mirrored plaintiff's in this case, but it was rejected. This court held the privilege absolute, not obviated by "actual malice or the intent to do harm." (*Id.* at p. 488.) "To hold otherwise would be inconsistent with the general public purpose of the privilege to encourage the utmost freedom of access to the courts and quasi-judicial bodies." (*Id.* at p. 489.)

*Thornton* v. *Rhoden, supra,* 245 Cal.App.2d 80 also supports the absolute quality of the privilege. There, a defamation suit was filed due to several unflattering remarks about Thornton at a deposition, which were allegedly the product of a conspiracy. The court disposed of the suit by relying on section 47 and holding the remarks privileged ". . . regardless of the good faith *vel non* of the defamer. 'It [the privilege] protects the attorney from liability in an action for defamation irrespective of his purpose in publishing the defamatory matter, his belief in its truth or even his knowledge of its falsity.' [Citation.] In the present case, if the allegations against Rhoden are true, he may have been guilty of conspiracy to commit perjury. [Citations.]

---

[2]It is not contested that a deposition is a "judicial proceeding" within the meaning of the statute. (See *Thornton* v. *Rhoden* (1966) 245 Cal.App.2d 80, 93 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152], and *Mortensen* v. *Los Angeles Examiner* (1931) 112 Cal.App. 194, 202-206 [296 P. 927].)

The sanctions for such conduct, if proven, would be found in the criminal law and possibly in contempt or disciplinary proceedings. [Citation.]" (*Id.* at pp. 93-94.)

Notwithstanding our ruling in *Pettitt, supra,* 28 Cal.App.3d 484, and the existence of alternative sanctions as mentioned in *Thornton, supra,* plaintiff asks us to adopt contrary views expressed in *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818 [106 Cal.Rptr. 718]. While *Bradley* recognized the importance of the statute to the smooth administration of justice, it nevertheless limited the scope of the privilege by laying "*special emphasis . . . on the requirement that [the communication] be made in furtherance of the litigation and to promote the interest of justice.*" (*Id.* at p. 826, italics in original.) Since the evidence in *Bradley* indicated documents were filed with the court as part of a conspiracy to ensure immunity for the defamatory remarks contained in the documents, the court concluded the statements "were not made to achieve the objects of the litigation and to promote the unfettered administration of justice." (*Id.* at p. 828.) As such, no privilege attached.

*Bradley*'s reasoning was rejected in *O'Neil* v. *Cunningham* (1981) 118 Cal.App.3d 466, 475 [173 Cal.Rptr. 422]; it was, however, reaffirmed in *Barbary Coast Furniture Co.* v. *Sjolie* (1985) 167 Cal.App.3d 319 [213 Cal.Rptr. 168]. The latter court stated it simply was not prepared to condone and encourage the "resourceful slanderer" by acknowledging an absolute privilege.

"In essence, we cannot accept the analysis of the court in *Pettitt* . . . that heinous conduct must be condoned lest greater mischiefs occur, whereas we can and do endorse the *Bradley* reasoning that an overly broad construction of section 47, subdivision 2, is bound to encourage wrongful conduct immune from judicial redress." (*Id.* at p. 334.)

We are now faced with the identical conflict of views as to the construction of section 47, subdivision 2, that *Barbary Coast Furniture Co.* attempted to resolve. As with all statutory interpretation, we look first to legislative history. When first enacted by the 1872 Fields Code, section 47, subdivisions 3 and 4, mandated that statements be "without malice" as the threshold to statutory protection. On the other hand, subdivision 2 of section 47 as originally enacted contained no similar requirement that the publication be without malice.

The significance of this legislative history was discussed by our Supreme Court in *Gosewisch* v. *Doran* (1911) 161 Cal. 511, 514-515 [119 P. 656]: " 'Malice,' says the court in *Hollis* v. *Meux* [(1886) 69 Cal. 625], 'cannot be

[the predicate of a limitation]. No one is permitted to allege that what was rightly done in a judicial proceeding was done with malice.' That malice is not a subject of inquiry where a defamatory statement, relevant to the injury, is made in the course of a judicial proceeding, is not only established by the decided cases [citations omitted], but it is plainly shown by the terms of section 47. . . . Subdivisions 3, 4, and 5 of that section . . . make the privilege, in each case, dependent upon the want of malice. But subdivision 2 is not so qualified."

Additionally, as petitioners correctly contend, subsequent amendments of section 47, subdivision 2, provide insight into its intended meaning. In 1927, a proviso was added which "changed the absolute privilege to a conditional privilege in a single subclass of judicial proceedings—divorce proceedings" (Comment, *Absolute Privilege and California Civil Code section 47(2): A Need for Consistency* (1982) 14 Pacific L.J. 105, 108) by denying the privilege unless the statements were made without malice. In considering this amendment, the court in *Moore* v. *United States F. & G. Co.* (1932) 122 Cal.App. 205 [9 P.2d 562] stated "[A]s far as the legislature could enact, the privilege was made absolute, limited only by the proviso. . . . Obviously, if it had been the legislative intent to extend only a conditional privilege in all cases, the proviso would be meaningless and needless." (*Id.* at pp. 210-211.)

This statutory history becomes even more compelling in light of the policy which underlies the privilege. The importance of the basic rationale behind an axiom cannot be underestimated; "[p]olicy is . . . the moving force that justifies the existence of the law and the unifying factor that results in [its] homogeneous application." (Comment, *supra,* 14 Pacific L.J., p. 109.) Section 47, subdivision 2, simply put, is the backbone to an effective and smoothly operating judicial system. That statutory privilege "afford[s] litigants the utmost freedom of access to the courts to secure and defend their rights without fear of being harassed by actions for defamation. [Citation.] It would be anomalous to hold that a litigant is privileged to make a publication necessary to bring an action but that he can be sued for defamation if he lets anyone know that he has brought it [citation]." (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 380 [295 P.2d 405].)

In *Pettitt,* this court embraced these same ideas, first proposed by Justice Traynor. We recognized that open channels of communication and the presentation of evidence were "a fundamental adjunct to the right of access to judicial and quasi-judicial proceedings." (*Pettitt* v. *Levy, supra,* 28 Cal.App.3d at pp. 490-491.) Communication hindered by an external threat of liability is destructive of this fundamental right and inconsistent with the effective administration of justice.

The United States Supreme Court reiterated these concerns in *Briscoe* v. *LaHue* (1983) 460 U.S. 325 [75 L.Ed.2d 96, 103 S.Ct. 1108]. After noting that " 'the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible' [citations omitted]" (*id.* at p. 333 [75 L.Ed.2d at p. 106]), the court expressed concern over witnesses' reluctance to testify, as well as testimony distorted by fears of protracted and costly defamation suits.

Admittedly, as with the print media's contention that defamation liability affects their editorial decisions, this chilling effect upon witnesses is theoretical. However, when our Supreme Court has concluded that "[u]nderlying the privilege is the vital public policy of affording free access to the courts and facilitating the crucial functions of the finder of fact" (*Ribas* v. *Clark* (1985) 38 Cal.3d 355, 364-365), we must adhere to the policy. The fears of chilled speech and hindered justice are too much a part of our case law to be disregarded as unproved.

We conclude that allegations of conspiracy do not pierce the protective shield embodied in the statute. While the *Bradley* court attempted to effectuate the policy of free access, it ignored legislative history, limited the application of the privilege and hindered the consistent application of policy necessary to a uniform interpretation of the statute. (Comment, *supra,* 14 Pacific L.J., pp. 110-111.) As Prosser noted, "The resulting lack of any really effective civil remedy against perjurers is simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say." (Prosser, Law of Torts (4th ed. 1971) p. 778.) We continue to adhere to the views expressed in *Pettitt* without inquiring whether the publication promotes the interests of justice as required in *Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App. at page 826, and *Barbary Coast Furniture Co.* v. *Sjolie, supra,* 167 Cal.App.3d at pages 334-335. This adherence seems justified by the Supreme Court's specific mention of *Pettitt* in its opinion in *Ribas* v. *Clark, supra,* 38 Cal.3d at pages 364-365, and its recognition there that heinous conduct must sometimes be condoned to preserve free access to the courts. (See *Steiner* v. *Eikerling* (1986) 181 Cal.App.3d 639, 642, fn. 3 [226 Cal.Rptr. 694].)

In addition to the degree of protection provided by section 47, the parties also disagree over the relationship, if any, the privileged statement must have to the proceedings in which it originated. Plaintiff contends Walsh's statements were not in any way related to the Todisco litigation and consequently were not protected. While we will find that a nexus requirement does exist, plaintiff's argument must fail because the statements made by Walsh were indeed reasonably related to the underlying litigation.

Petitioners' summary of the legislative history of section 47 accurately states the 1874 amendment removed the requirement that the statement be "pertinent and material." Additionally, petitioners persuasively argue it is significant that the 1927 divorce proviso contains a requirement that the "allegation or averment be material and relevant to the issues in such action." From this amendment, petitioners logically reason that the Legislature did not intend materiality and relevancy requirements to be read into section 47, subdivision 2; if such had been the case, the language of the 1927 amendment would be surplusage. While strict materiality and relevance requirements do not apply, it is clear that numerous decisions have added a judicial gloss to the privilege afforded by section 47 that requires the statements to further the object of the litigation and be reasonably related thereto.

The Supreme Court's opinion in *Albertson v. Raboff, supra,* 46 Cal.2d 375 was apparently the first case to require that the statements or privileged material must "achieve the objects of the litigation" and have a "reasonable relation to the action." (*Id.* at p. 381.) This requirement has been embraced by subsequent decisions. In *O'Neil v. Cunningham, supra,* 118 Cal.App.3d 466, relied upon by petitioners for the premise that no reasonable nexus limitation exists, the court was quite explicit: "It is true that a certain judicial gloss has been placed upon the section so that it does not have quite the uninhibited result we ventured above. In *Royer v. Steinberg* (1979) 90 Cal.App.3d 490 . . ., the court said that the qualifications on the absolute privilege . . . are that the publication has some connection or logical or reasonable relation to the proceeding and that the publication be made to achieve the object of the litigation." (*Id.* at pp. 474-475.)

This court acknowledged this judicially developed qualification in the *Pettitt* case. More important, language from that decision helps clarify the conflict presented by the legislative amendment omitting materiality and relevance requirements and the subsequent case law which seems to have reintroduced that which the amendment removed: "The absolute privilege attaches to any publication that has any reasonable relation to the action and is made to achieve the objects of the litigation . . . . The publication need not be pertinent, relevant or material in a technical sense to any issue if it has some connection or relation to the proceedings. [Citations.]" (*Pettitt v. Levy, supra,* 28 Cal.App.3d at p. 489.) This statement is consistent with language in *Bradley,* where the court noted that while "the defamatory matter need not be relevant, pertinent or material to any issue before the court, *it is an absolute necessity that the publication have some connection or logical*

*relation to the judicial proceeding* [citations]." (*Bradley* v. Hartford Acc. & Indem. Co., supra, 30 Cal.App.3d at p. 824.)[3]

The legislative history of section 47 does not support a conclusion that the limitation developed by these cases should be cast aside. The language in *Pettitt* and in *Bradley* indicates the judicial interpretation is not necessarily inconsistent with legislative intent. Indeed, the cases seem to require a threshold more lax than the concept of relevancy itself.

While it may be a question of fact whether the required connection existed, it is not necessarily so. In *Pettitt, supra,* and *O'Neil, supra,* both courts freely decided the relationship issue as if it were a question of law. Moreover, in the *Younger, supra,* and *Barbary Coast Furniture Co., supra,* cases the trial courts had granted summary judgment motions; the appellate courts, however, independently considered the reasonable-relationship requirement and concluded for themselves whether or not the nexus element had been satisfied. (*Younger* v. *Solomon, supra,* 38 Cal.App.3d at pp. 301-302; *Barbary Coast Furniture Co.* v. *Sjolie, supra,* 167 Cal.App.3d at pp. 334-335.)

■ The Todisco litigation concerned an August 19, 1979, Fresno Bee article (1979 article), researched and written by Walsh, dealing with the infiltration of organized crime into Fresno and characterizing Todisco as a "mob lawyer" and a "known associate and sometimes business partner of organized crime figures." Todisco noticed the deposition of Walsh; the notice requested Walsh to produce "all notes and other documents" on which he relied in writing the 1979 article. Pursuant to this request Walsh produced numerous documents, including the Gill Report, which mentioned Todisco in several places. Walsh was questioned about his reliance on the Gill Report and about his conclusions that a "Fresno mob" existed. Those questions related to the Todisco litigation. Further questions of Walsh about his knowledge of mob figures and his basis for believing any such figure was a part of the "Fresno mob" were similarly connected with the Todisco litigation to substantiate a reasonable basis for the 1979 article. Organized crime in Fresno and

---

[3]For clarification, we note that this court's decision in *Younger* v. *Solomon* (1974) 38 Cal.App.3d 289 [113 Cal.Rptr. 113] is not inconsistent with the holding in *Pettitt*. While *Younger* does cite *Bradley* with approval, it does so only in support of the proposition that the challenged statement must have some connection or logical relation to the proceeding in which it was made. *Younger* does not embrace the requirement that the statement must "promote the interests of justice," the specific language in *Bradley* which has been used to curtail the application of the privilege. Moreover, the language in the *Bradley* case has caused consternation among lower courts; in certain parts of that decision, the court freely interchanges the requirement that the statements achieve the objects of the litigation and also promote the interests of justice. Such an interchange is not warranted. We agree with the requirement that the statements must have some logical relation to the judicial proceeding and must be made to achieve the objects of that proceeding. However, we do not embrace the "promotion of the interests of justice" qualification to the absolute privilege.

Todisco's apparent connection to it were at the heart of the Todisco litigation. The reference to Todisco in the Gill Report connected that report to the Todisco litigation.

Given the lenient application of the "logical connection test," we hold that it was satisfied here as a matter of law; no triable issue of fact exists on this question. (See *O'Neil* v. *Cunningham, supra,* 118 Cal.App.3d at p. 475; *Thornton* v. *Rhoden, supra,* 245 Cal.App.2d 80, 93.)

B. *Section 47, Subdivision 4: A Fair and True Report of Judicial Proceedings.*

Petitioners claim the protective shield of section 47, subdivision 4, applies to the alleged defamatory statements in the 1982 article. It provides that "[a] privileged publication . . . is one made—[¶] . . . 4. By a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceedings, or (4) of anything said in the course thereof." Plaintiff counters that no privilege attaches to the 1982 article because it was produced pursuant to a conspiracy designed to invoke the immunity. Additionally, plaintiff attacks the fairness and accuracy of the 1982 article.

While our discussion of the absolute immunity provided by section 47, subdivision 2, appears to support a similar immunity under subdivision 4, we recognize that different policy considerations are involved when the media are reporting the contents of a judicial proceeding.

Before section 47, subdivision 4, was amended in 1945, it provided immunity for a publication "[b]y a fair and true report in a newspaper, without malice, of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof." After the Legislature deleted the requirement that the report be without malice, that subdivision was interpreted as providing an absolute privilege. (See, e.g., *Green* v. *Cortez* (1984) 151 Cal.App.3d 1068, 1074 [199 Cal.Rptr. 221]; *Conklin* v. *Sloss* (1978) 86 Cal.App.3d 241, 247 [158 Cal.Rptr. 121].) Even when the print media publish an accurate report of a statement they *know to be false,* the protective cloak of subdivision 4 remains intact, not penetrated by a finding of malice. (*Jennings* v. *Telegram-Tribune Co.* (1985) 164 Cal.App.3d 119, 128 [210 Cal.Rptr. 485]; *Grillo* v. *Smith* (1983) 144 Cal.App.3d 868, 873 [193 Cal.Rptr. 414].)

The privilege accorded reports of judicial and other official proceedings stems from the democratic nature of our government. In our society, the power resides with the People; public supervision of governmental administration through informed voting is the cornerstone of democracy. Hence:

"The fair report privilege is required because of the public's need for information to fulfill its supervisory role over government. Thus, reports of official proceedings are not privileged 'merely to satisfy the curiosity of individuals,' but to tell them how their government is performing. While the public may not have an overriding interest in knowing the details of every crime committed, its interest in overseeing the conduct of the prosecutor, the police, and the judiciary is strong indeed." (Note, *When Truth and Accuracy Diverge: The Fair Report of a Dated Proceeding* (1982) 34 Stan.L.Rev. 1041, 1049-1050, fns. omitted.)

This supervisory responsibility was recognized by the United States Supreme Court in *Cox Broadcasting Corp. v. Cohn* (1975) 420 U.S. 469, 491-492 [43 L.Ed.2d 328, 347, 95 S.Ct. 1029]: "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed on the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice."

In light of these substantial public concerns and the legislative history of section 47, subdivision 4, we conclude that the privilege provided a report of a judicial proceeding is not vitiated by conspiracy claims. But this conclusion in no way detracts from the requirement that the report be fair and accurate.

 Plaintiff contends the 1982 article failed to fairly and accurately report Walsh's testimony and the contents of the Gill Report. While recognizing that a word-for-word account is not necessary, plaintiff argues that the 1982 article contained conclusionary, fractionalized and unrepresentative statements from Walsh's deposition and from the Gill Report.

 The meaning of a "fair and true report" is well established in California case law. It is undenied that a media defendant does not have to justify every word of the alleged defamatory material that is published. (*Kurata v. Los Angeles News Pub. Co.* (1935) 4 Cal.App.2d 224, 227-228 [40 P.2d 520].) The media's responsibility lies in ensuring that the "gist or sting" of the report—its very substance—is accurately conveyed. (*Hayward* v.

*Watsonville Register-Pajaronian & Sun* (1968) 265 Cal.App.2d 255, 262 [71 Cal.Rptr. 295].) Moreover, this responsibility carries with it a certain amount of literary license. The reporter is not bound by the straitjacket of the testifier's exact words; a degree of flexibility is tolerated in deciding what is a "fair report." (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d 244, 262, fn. 13.) ■ With these concepts in mind, we evaluate plaintiff's attack on the fairness and truth of the Fresno Bee article of May 31, 1982. ■ Although the trial judge specifically found this to be a controverted issue and hence not proper for summary judgment disposal, case law indicates this decision is one of law when, as here, there is no dispute as to what occurred in the judicial proceeding reported upon or as to what was contained in the report.

In support of his contention that it is a factual issue whether a report is fair and true, plaintiff cites *Handelsman* v. *San Francisco Chronicle* (1970) 11 Cal.App.3d 381 [90 Cal.Rptr. 188]. However, that case held only that it was not error to leave to the jury the determination of whether the article was fair and true. The court stated in dicta that "the effect produced by the particular words used in the article and the *fairness of the report* is a question of fact *for the jury*. [Citation.]" (*Id.* at p. 386.) On the other hand, in *Kilgore* v. *Younger* (1982) 30 Cal.3d 770 [180 Cal.Rptr. 657, 640 P.2d 793], our Supreme Court held that the "fair and true" requirement was satisfied as a matter of law. In that case, there was no dispute as to the contents of the report or the news release reported upon. The court concluded that the newspapers captured the substance of the news release: "[I]n other words, we simply do not believe that the average reader would take the article to intimate that Kilgore [plaintiff] was involved in every—or even necessarily more than one—type of organized criminal activity." (*Id.* at p. 777.) Similar conclusions as a matter of law were reached in *Jennings* v. *Telegram-Tribune Co., supra,* 164 Cal.App.3d 119, 127 , and *Grillo* v. *Smith, supra,* 144 Cal.App.3d 868, 873-874.

■ The 1982 article contained two allegedly damaging references to plaintiff. The first reference was to Walsh's testimony that plaintiff and others were part of the so-called Fresno mob. This report of what was said was completely accurate; Walsh named those individuals he felt had ties to organized crime in this area. The piecemeal list was reproduced in the body of the article. This report accurately conveyed the "gist" of the testimony. Moreover, it was not unrepresentative or used out of context; plaintiff's name was not singled out for attack nor was it set forth in the article so as to draw the reader's immediate attention.

The second reference to plaintiff in the 1982 article appeared in a verbatim quote from the Gill Report: " 'The respective individuals who appear to be controlling these activities,' the report continues, 'are Gary Prestidge, Edward Meyers, Donald Louis Edwards, Vincent Todisco, Paul S. Mosesian and Gino Copola.' "

This word-for-word account of the Gill Report as used in Walsh's deposition can hardly be considered unfair. A verbatim use of the alleged defamatory material reported in its proper context not only presents the gist and sting of the statement, but it epitomizes the meaning of "fair and true report."

Based on the undisputed facts presented to the trial court concerning the 1982 article and the matters it reported, we hold the 1982 article was a fair and true report within the meaning of section 47, subdivision 4, as a matter of law. Summary judgment for petitioners should, therefore, have been granted based on the privilege provided by section 47, subdivision 4.

Our conclusions that the statutory privileges of section 47, subdivisions 4 and 2, respectively, apply to the 1982 article and the matters it reported make it unnecessary to consider petitioners' contentions based on federal and state constitutional protections.

Let a peremptory writ of mandate issue directing respondent court to set aside its order denying petitioners' motion for summary judgment and to enter a new order granting petitioners' motion. Except as expressly granted, the petition is denied. Petitioners shall recover from plaintiff their costs in this proceeding. (*Oksner* v. *Superior Court* (1964) 229 Cal.App.2d 672 [40 Cal.Rptr. 621].)

Brown, (G. A.), P. J., and Woolpert, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied May 14, 1987.